The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>ROBEL KELETA GOITOM,<br><br>    Defendant. | NO. CR24-00040<br><br>GOVERNMENT'S OPPOSITION TO GOITOM'S MOTION TO DISMISS |

## I.    INTRODUCTION

Courts including the Ninth Circuit have consistently held that Congress's prohibition of possession of firearms by those convicted of felonies is constitutional under the Second Amendment. Goitom nevertheless challenges the constitutionality of the federal prohibition on possession of a firearm by people who have been convicted of a felony. Based on the law as it now stands, Goitom offers the Court no avenue to conclude

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that Section 922(g)(1) violates the Second Amendment either on its face or as applied to him. The Court should deny his motion.

## II.    STATEMENT OF THE FACTS

The facts of this case are set forth in the Government's Response to Goitom's Motion to Suppress and incorporated herein by reference. Additional facts relevant to this response are set out in the argument section that follows.

## III.    ARGUMENT

**A.    *Vongxay* holds that 18 U.S.C. § 922(g)(1) does not violate the Second Amendment.**

In *United States v. Vongxay*, 594 F.3d 1111, 1114–15 (9th Cir. 2010), the Ninth Circuit upheld 18 U.S.C. § 922(g)(1) against a Second Amendment challenge, finding that "felons are categorically different from the individuals who have a fundamental right to bear arms . . . ." This is binding precedent that forecloses Goitom's challenge to his indictment. *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) ("Our decision in *Vongxay* forecloses Phillips's argument, and we accordingly affirm the district court's denial of Phillips's motion to dismiss the indictment."); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014) ("In light of [*United States v.*] *Chovan*[, 735 F.3d 1127, 1137–38 (9th Cir. 2013),] and *Vongxay*, we believe that § 922(g)(1) continues to pass constitutional muster."); *see also Mai v. United States*, 952 F.3d 1106, 1113 (9th Cir. 2020) (relying on *Vongxay* in analyzing constitutionality of 18 U.S.C. § 922(g)(4)). While a panel of the Ninth Circuit held in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), that *Vongxay* was no longer good law in the wake of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), that opinion has been vacated. *Vongxay* thus still binds this Court, and Goitom's motion to dismiss must be denied. *Phillips*, 827 F.3d 1175 (finding that considering *Vongxay*, Phillips' nonviolent conviction for misprision of felony can serve as a predicate offense for a Section 922(g)(1) conviction).

Government's Opposition to Goitom's Motion to Dismiss – 2
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.**  ***Vongxay* is not clearly irreconcilable with intervening Supreme Court decisions.**

*Vongxay* remains binding precedent, as it is not clearly irreconcilable with intervening Supreme Court decisions. *United States v. Russell*, No. 2:23-CR-00142-TL, 2024 WL 4107312, at *3 (W.D. Wash. Sept. 6, 2024) (holding that *Vonxgay* is not clearly irreconcilable with *Bruen* and *Rahimi* and collecting cases from other district courts in the Ninth Circuit reaching the same conclusion); *see also United States v. Huff*, No. CR23-5359-BHS (W.D. Wash. Aug. 29, 2024), Dkt. No. 43 at 2–3 ("The Court concludes that because the Ninth Circuit vacated *Duarte*, it is once again bound by *Vongxay* and it therefore DENIES Huff's motion to withdraw his guilty plea.").

Under *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc), "prior circuit law" is controlling unless its "reasoning or theory . . . is clearly irreconcilable with the reasoning or theory of intervening higher authority." Clear irreconcilability is a "narrow," "high standard." *United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023) (citations omitted). It requires a case "closely on point." *United States v. Dunn*, 728 F.3d 1151, 1156 (9th Cir. 2013) (quoting *Miller*, 335 F.3d at 899). And that case cannot simply create "tension" or "cast doubt" on earlier cases. *Tingley v. Ferguson*, 47 F.4th 1055, 1075 (9th Cir. 2022) (citations omitted); *cf. Musladin v. Lamarque*, 555 F.3d 830, 837 (9th Cir. 2009) (courts must follow "directly on point" Supreme Court cases even if "subsequent decisions cast strong doubt on" them). Nor can a later case merely "chip[] away at" or give "strong[] signals" about earlier cases. *United States v. Green*, 722 F.3d 1146, 1150 (9th Cir. 2013). Instead, the case must clearly "compel" a "holding" at odds with earlier ones. *Dunn*, 728 F.3d at 1157.

*Miller* addressed the situation where Ninth Circuit caselaw had extended "absolute immunity" for family–service social workers beyond "the initiation and pursuit of child dependency proceedings," and applied it to post–adjudication activities taken in connection

Government's Opposition to Goitom's Motion to Dismiss – 3
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   with and incident to ongoing child dependency proceedings. *Id.* at 895. Subsequently, the

2   Supreme Court held that "absolute immunity shields only those who perform a function

3   that enjoyed absolute immunity at common law," and that absolute immunity did not attach

4   to an action just because it was "taken with court approval or under a court's direction."

5   *Id.* at 897. The Ninth Circuit noted that "[t]he relation of the action to a judicial proceeding,

6   the test we formulated . . . is no longer a relevant standard." *Id.* Its precedent was "clearly

7   irreconcilable" with intervening Supreme Court authority, because "the blanket absolute

8   immunity for social workers recognized in *Babcock* is directly at odds with the functional

9   approach taken by the Supreme Court in *Antoine* and *Kalina*." *Id.* at 900.

10        But in *Miller*, it was not just the mode of analysis of prior Ninth Circuit caselaw that

11   conflicted with the intervening Supreme Court law; the results were incompatible.

12   Subsequently, the Ninth Circuit has held that even when the reasoning of circuit precedent

13   has been invalidated by an intervening Supreme Court decision, the holding—contrasted

14   with the rationale—of the precedent is still binding, where that holding is consistent with

15   the intervening Supreme Court decision. *Vongxay*, 594 F.3d at 1116 ("Our examination of

16   cases from other circuits and of historical gun restrictions also lends credence to the post–

17   [*District. of Columbia v. Heller*, 554 U.S. 570 (2008)] viability of [*United States v.*

18   *Younger*, 398 F.3d 1179 (9th Cir. 2005)]'s holding," by which "we are still bound," even

19   though "[t]he reasoning upon which *Younger* was based" "was invalidated by *Heller*.").

20   Goitom grapples with none of this, stating only "The *Bruen* and *Rahimi* opinions have

21   announced a completely different standard tha[n] that on which *Vongxay* was based,

22   making it no longer good law." Dkt. No. 41 at 9. But that is not the test *Miller* prescribes.

23        *Vongxay* is not clearly irreconcilable with intervening Supreme Court precedent in

24   either its holding or its mode of analysis. No Supreme Court decision has held that Section

25   922(g)(1) is unconstitutional. Instead, the Supreme Court has repeatedly stated that its

26   decisions are not to suggest that felons have a constitutional right to possess firearms. In

27

Government's Opposition to Goitom's Motion to Dismiss – 4
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   *Heller*, the Court stated that "[a]lthough we do not undertake an exhaustive historical

2   analysis today of the full scope of the Second Amendment, nothing in our opinion should

3   be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons

4   . . . ." 554 U.S. at 626. In *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010), the

5   Court took care to "repeat those assurances." Most recently, in *United States v. Rahimi*, the

6   Supreme Court held that 18 U.S.C. § 922(g)(8), a firearm regulation like 18 U.S.C. §

7   922(g)(1), did not violate the Second Amendment. 602 U.S. 680 (2024). In so doing, the

8   Court again referred to *Heller*'s language that "many . . . prohibitions, like those on the

9   possession of firearms by 'felons . . .' are 'presumptively lawful.'" *Id* at 682 (quoting

10  *Heller*, 554 U.S. at 626–27 & n.26). While the Court's discussions of Section 922(g)(1)

11  have been in dicta, the latest statements by the Court were made with full knowledge that

12  defendants are raising challenges to Section 922(g)(1). *See Cunningham v. United States*,

13  144 S. Ct. 2713 (July 2, 2024) (granting writ of certiorari, vacating judgment of Eighth

14  Circuit's decision at 70 F.4th 502—finding 18 U.S.C. § 922(g)(1) constitutional—for

15  further consideration in light of *Rahimi*); *see also Garland v. Range*, 144 S. Ct. 2706 (July

16  2, 2024) (granting writ of certiorari, vacating judgment of Third Circuit's decision at 69

17  F.4th 96 (en banc)—which found 18 U.S.C. § 922(g)(1) unconstitutional as applied to

18  defendant whose prior felony was for making a false statement to obtain food stamps—for

19  further consideration in light of *Rahimi*).

20      In addition, several justices have taken care, outside of the majority opinion, to

21  emphasize their view that prohibitions on the possession of firearms by felons are

22  consistent with the Second Amendment. In *Bruen*, Justice Kavanaugh, joined by Chief

23  Justice Roberts, stated his understanding that *Heller*'s reservation of "longstanding

24  prohibitions on the possession of firearms by felons" from Second Amendment protection

25  was still proper after *Bruen*. 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller*,

26

27

Government's Opposition to Goitom's Motion to Dismiss – 5
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

554 U.S. at 636).[1] In their *Bruen* dissent, Justices Breyer, Sotomayor, and Kagan shared Justice Kavanaugh's view that disarmament of felons did not violate the Second Amendment. *Id.* at 129–30 (Breyer, J., dissenting). And in *Rahimi*, Justice Kavanaugh reiterated that prohibitions on the possession of firearms by felons was a "traditional exception[]" to the Second Amendment right. *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring).

*Vongxay*'s mode of analysis is also consistent with the methodology prescribed by *Bruen*. As *Rahimi* explained, courts should "consider[] whether the challenged regulation is consistent with the principles that underpin" "our 'historical tradition of firearm regulation.'" 602 U.S. at 692. A modern law regarding firearm regulation that is "'relevantly similar' to laws that our tradition is understood to permit" is "lawful under the Second Amendment." *Id. Vongxay* did not employ the means–end scrutiny that *Bruen* rejected, *Bruen*, 597 U.S. at 17, but in *Vongxay*, the court looked to the text of the Second Amendment and "historical gun restrictions" to understand the Second Amendment as permitting disarmament of felons. *Vongxay*, 594 F.3d at 1116. "Denying felons the right to bear arms" is "consistent with the explicit purpose of the Second Amendment to maintain 'the security of a free State.'" *Id.* at 1117 (quoting U.S. Const. amend. II). "Felons are often, and historically have been, explicitly prohibited from militia duty." *Id.* And based on restrictions at common law, the drafters of the Second Amendment contemplated reasonable regulations on firearms. *Id.* at 1117 (citation omitted). The Ninth Circuit explained that "nothing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114. In fact, the court found that *Heller*

---

[1] Other aspects of *Bruen* offer further support. For one, the Court said repeatedly that it was addressing the rights of "law-abiding citizens." *Bruen*, 597 U.S. at 8–9; *see United States v. Perez–Garcia*, 96 F.4th 1166, 1179 & n.9 (9th Cir. 2024) (collecting examples). It also noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of licensing regimes that "require applicants to undergo a background check." *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Of course, many of those regimes bar giving felons guns.

Government's Opposition to Goitom's Motion to Dismiss – 6
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   "explained" that "'[f]rom Blackstone through the 19th–century cases, commentators and
2   courts routinely explained that the [Second Amendment] right was not a right to keep and
3   carry any weapon whatsoever in any manner whatsoever and for whatever purpose,'" and
4   "'*nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on*
5   *the possession of firearms by felons*. . . .'" *Id.* at 1115 (quoting *Heller*, 554 U.S. at 626)
6   (emphasis added by the *Vongxay* court). While *Vongxay*'s historical analysis was not
7   robust, it was not clearly irreconcilable with *Bruen*, as *Miller* would require for any
8   determination that *Bruen* overruled *Vongxay*. *Miller*, 335 F.3d at 893.

9        For all these reasons, this Court should conclude that Ninth Circuit precedent
10  forecloses Goitom's challenge to Section 922(g)(1).

11  **C.      Section 922(g)(1) does not violate the Second Amendment**

12       Even if this Court were permitted to set aside *Vongxay*'s holding and review the
13  constitutionality of Section 922(g)(1) anew, it should conclude that the statute is consistent
14  with the Second Amendment.

15  **D.      Methodology under the Second Amendment**

16       The Second Amendment "secures for Americans a means of self–defense," and is
17  fundamental. *Rahimi*, 602 U.S. at 690. But the right is not unlimited, and it "was never
18  thought to sweep indiscriminately." *Id.* It is "'not a right to keep and carry any weapon
19  whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* (quoting *Heller*, 554
20  U.S. at 626). To determine whether a statute such as 18 U.S.C. § 922(g)(1) violates the
21  Second Amendment, this Court must "first consider whether the Amendment's plain text
22  covers an individual's proposed course of conduct." *Perez–Garcia*, 96 F.4th at 1178. "If
23  so," the question is then whether the government can "justify[] the regulation by showing

24
25
26
27

Government's Opposition to Goitom's Motion to Dismiss – 7
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   that it is consistent with our nation's 'historical tradition of firearm regulation.'" *Id.*

2   (quoting *Bruen*, 597 U.S. at 24).[2]

3       In *Rahimi*, the Supreme Court clarified this "methodology of our recent Second

4   Amendment cases." 602 U.S. at 692. To show that a statutory prohibition is consistent with

5   our nation's historical tradition of firearm regulation, the government need not point to a

6   Founding–Era law that is a "'dead ringer' or a 'historical twin'" to the challenged

7   regulation. *Id.* (quoting *Bruen*, 597 U.S. at 30). Rather, the government must show that

8   "the challenged regulation is consistent with the principles that underpin our regulatory

9   tradition," and is a faithful application of the "'balance struck by the founding generation

10  to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29). An exact match is

11  unnecessary. The government need only show that the challenged regulation is "'relevantly

12  similar' to laws that our tradition is understood to permit." *Id.* (citing *Bruen*, 597 U.S. at

13  26–31). The modern and historical laws are relevantly similar, or analogous, if they share

14  their "[w]hy[s] and how[s]"—that is, if they are aimed at addressing similar problems, and

15  burden the right to bear arms to a similar extent. *Id.*

16      Goitom several times suggests (Dkt. No. 41 at 4, 9–10) that the government must

17  point to a "distinctly similar" historical regulation, but he is wrong. *Rahimi*, which clarified

18  *Bruen*, did not apply or even mention the "distinctly similar" standard when assessing the

19  constitutionality of 18 U.S.C. § 922(g)(8). *Rahimi*, 602 U.S. at 692. The majority instead

20  used the "relevantly similar" formulation. *Id.* Even Justice Thomas's *Rahimi* dissent, after

21  mentioning the "distinctly similar" phrase, used the "relevantly similar" standard—despite

22  concluding that Section 922(g)(8) addressed a longstanding societal problem. 602 U.S. at

23  750, 953 (Thomas, J., dissenting).

24  ────────────────

25  [2] In his motion, Goitom repeatedly cites the Ninth Circuit's since-vacated decision in *Teter v. Lopez*, 76
    F.4th 938 (9th Cir. 2023), *vacated by* 93 F.4th 1150 (9th Cir. 2024). Rather than reinstating the original
26  panel decision, the en banc Ninth Circuit issued a new opinion in *Teter*, see -- F.4th --, 2025 WL 259979
    (9th Cir. Jan. 22, 2025) (en banc). That opinion concluded the matter was moot and did not discuss the post-
27  *Rahimi* methodology for considering Second Amendment challenges. *Id.* at *6.

Government's Opposition to Goitom's Motion to Dismiss – 8
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Employing the "relevantly similar" standard, the Court in *Rahimi* rejected a facial challenge to 18 U.S.C. § 922(g)(8). 602 U.S. at 700 ("In short, we have no trouble concluding that Section 922(g)(8) survives Rahimi's facial challenge."). Section 922(g)(8) prohibits possession of a firearm by a person subject to a domestic violence restraining order issued by a court "after a hearing of which such person received actual notice, and at which such person had an opportunity to participate," and upon "a finding that such person represents a credible threat to the physical safety of such intimate partner or child," or where the terms of the restraining order "explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." 18 U.S.C. § 922(g)(8). The Supreme Court concluded that there is a historical tradition of disarming, "through ordinary criminal laws and civil actions" persons "who physically threatened others." *Rahimi*, 602 U.S. at 681. Surety laws, which "provided a mechanism for preventing violence"—including spousal violence—"before it occurred," and "going armed laws" (codified or common–law), which "punish[ed] those who had menaced others with firearms," "specifically addressed firearms violence." *Id.* at 681–82.

And the focus need not be on laws alone. As Justice Barrett explained in her *Rahimi* concurrence, looking only to founding-era laws to derive the principles that underpin our regulatory tradition "assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed." *Id.* at 1925 (Barrett, J., concurring). Thus, while "traditional firearm regulations are an important form of historical evidence, they are not the only one." *Perez-Garcia*, 96 F.4th at 1191. Courts must also consider "a variety of legal and other sources." *Heller*, 554 U.S. at 605. Those sources include "English history," "analogous provisions in state constitutions," "Second Amendment precursors," "commentary," "case law," and "legislative debates." *Perez-Garcia*, 96 F.4th at 1191. As with laws, all those

Government's Opposition to Goitom's Motion to Dismiss – 9
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  sources of evidence may be more or less probative in various ways, rendering a one-size-

2  fits-all approach improper.

3      *Rahimi*'s approach confirms that 18 U.S.C. § 922(g)(1) also falls within this

4  country's tradition of firearms regulation, as various courts of appeals have held. *See*

5  *Vincent v. Garland*, 80 F.4th 1197, 1197–1202 (10th Cir. 2023), *cert. granted, judgment*

6  *vacated*, 144 S. Ct. 2706 (July 2, 2024); *United States v. Cunningham*, 70 F.4th 502, 506

7  (8th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2713 (July 2, 2024); *United*

8  *States v. Jackson*, 69 F.4th 495, 501–06 (8th Cir. 2023), *cert. granted, judgment vacated*,

9  144 S. Ct. 2710 (July 2, 2024). Indeed, as the Fourth Circuit recently observed, every court

10  of appeals to have addressed the facial constitutionality of Section 922(g)(1) after *Rahimi*

11  has upheld the statute as constitutional or otherwise rejected a Second Amendment

12  challenge to that statute under plain error review. *United States v. Canada*, 123 F.4th 159,

13  161 (4th Cir. 2024) ("No federal appellate court has held that Section 922(g)(1) is facially

14  unconstitutional, and we will not be the first.") (following GVR by the Supreme Court to

15  reconsider in light of *Rahimi*);[3] *see also United States v. Langston*, 110 F.4th 408 (1st Cir.

16  2024); *United States v. Moore*, 111 F.4th 266 (3rd Cir. 2024); *United States v. Diaz*, 116

17  F.4th 458 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024); *United*

18  *States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024); *United States v. Whitaker*, No. 24–10693,

19  2024 WL 3812277, at *3 (11th Cir. Aug. 14, 2024).[4]

20  **E.     There is a historical tradition of disarming felons**

21

22  [3] "The law of the Second Amendment is in flux, and courts (including this one) are grappling with many

23  difficult questions in the wake of [*Bruen*] and [*Rahimi*]. But the facial constitutionality of Section 922(g)(1) is not one of them." *Id.*

24  [4] The Third Circuit on remand from the Supreme Court held in a "narrow" decision that Section 922(g)(1)

25  is unconstitutional as applied to a defendant "two decades after he was convicted of food-stamp fraud" and had "completed his sentence," where there was "no evidence that [he] posed a physical danger to others."

26  *Range v. Att'y Gen.*, 124 F.4th 218, 232 (3d Cir. 2024). *Range* does not support Goitom's facial challenge, nor does it help his as-applied challenge considering the crimes of which he has been convicted. *See infra*.

27

Government's Opposition to Goitom's Motion to Dismiss – 10
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Second Amendment right has long been understood to extend only to "law–abiding" persons. *Heller*, 554 U.S. at 635. In both England and America, "death was the standard penalty for all serious crimes at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (quotation omitted); *see* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769).[5] There is a "lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens," including "a long and broad history of legislatures exercising authority to disarm people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *Perez-Garcia*, 96 F.4th at 1186, 1191. Under that tradition, including the laws and practices discussed below, Section 922(g)(1) is a valid exercise of regulatory power under the Second Amendment.

In England before the Founding, capital punishment extended even to non–violent felonies, such as smuggling, 4 Blackstone at 89; fraudulent bankruptcy, *id.* at 89; violating quarantine, *id.* at 93; forging a marriage license, *id.* at 94; and cutting down a cherry tree, *id.* at 3. A felon awaiting execution would be held in prison where he would have no access to arms. *See id.* at 75 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 226–28. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 223. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, to bear arms, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

---

[5] *See* https://lonang.com/wp-content/download/Blackstone-CommentariesBk4.pdf.

Government's Opposition to Goitom's Motion to Dismiss – 11
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"The Founders shared a similar understanding." *Perez–Garcia*, 96 F.4th at 1183. "At the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses." *Id.* Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone at 31; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge [sic] or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, at 193 (Charles J. Hoadly ed., 1890).

As those enactments show, "colonies did not require violence or dangerousness for disarmament." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 908 (3d Cir. 2020). For example, "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous." *Jackson*, 110 F.th at 1128. Likewise, "defaming acts of Congress[] or failing to defend the colonies do not of themselves qualify as dangerous. The same is true of . . . refusing to swear allegiance or loyalty to the sovereign." *Folajtar*, 980 F.3d at 908 n.11. True, some of those laws are repugnant, and "would be impermissible today under other constitutional provisions" (like

Government's Opposition to Goitom's Motion to Dismiss – 12
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the First or Fourteenth Amendments). *Jackson*, 110 F.4th at 1127. But "they are relevant here in determining the historical understanding of the right to keep and bear arms." *Id.* That includes both the English and American practices given their similarity and bearing on the right the Second Amendment imported. *See Heller*, 554 U.S. at 592 n.16; *Perez-Garcia*, 96 F.4th at 1187; *Kanter v. Barr*, 919 F.3d 437, 457 n.5 (7th Cir. 2019) (Barrett, J., dissenting).

Many states also subjected certain felons to the complete forfeiture of their property. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn.275–76 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common–law doctrine of civil death. *See*, *e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law–abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge [sic] to keep Arms in Our houses for Our Own Defence [sic] and while we Continue honest and Lawfull [sic] Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966).

Proposals from the ratification conventions also suggest that the right to keep and bear arms did not and does not extend to felons. For example, in 1787, the Pennsylvania Antifederalists issued The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, which proposed an amendment recognizing a right to bear arms, "*unless for crimes committed, or real danger of public injury from individuals*." *Perez-Garcia*, 96 F.4th at 1188 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). As the text indicates, under that amendment, "criminals or other dangerous persons could be

Government's Opposition to Goitom's Motion to Dismiss – 13
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

disarmed." Stephen P. Halbrook, *The Founder's Second Amendment* 196 (2008). "Other states proposed similar amendments." *Folajtar*, 980 F.3d at 908. New Hampshire proposed an amendment stating that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* (citation omitted). And Samuel Adams of Massachusetts proposed an amendment requiring that "the said Constitution be never construed . . . to prevent the people of the United States[] who are peaceable citizens. . . from keeping their own arms." *Id.* (citation omitted). That amendment, in other words, clarified that "the right to keep arms extended only to 'peaceable citizens,' not to criminals." Halbrook, *supra*, at 206.

Of course, those proposals were not "adopted exactly as written." *Perez-Garcia*, 96 F.4th at 1188. But they were understood to be consistent with the Second Amendment as codified, which is why their drafters "did not object to the lack of an explicit exclusion of criminals." Halbrook, *supra*, at 273; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (similar). As the Ninth Circuit noted, "Adam's proposal was celebrated by his supporters as ultimately becoming the Second Amendment." *Perez-Garcia*, 96 F.4th at 1188 (citation omitted). "For example, an editorial in the *Boston Independent Chronicle* called for the paper to republish Adam's proposed amendments alongside Madison's proposed Bill of Rights. . . to show that every one of Adam's intended alterations but one" (on standing armies) "was adopted." *Id.* (citation omitted). Similarly, the Speaker of the House from Pennsylvania wrote in a letter that the Second Amendment "t[ook] in the principal Amendments which our Minority had so much at heart." Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789); *see also Whether the Second Amendment Secures an Individual Right*, Op. Off. Legal Counsel, pt. III.C.2, at 198–99 & nn.297– 98 (2004), *available at* http://www.usdoj.gov/olc/opinions.htm (discussing Boston article and letter from Speaker).

Government's Opposition to Goitom's Motion to Dismiss – 14
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In *Heller*, the Court deemed "New Hampshire's proposal, the Pennsylvania minority's proposal, and Samuel Adams' proposal in Massachusetts"—the proposals just cited— accurate reflections of the right to keep and bear arms, at least regarding its individual nature. 554 U.S. at 604. It also recognized that the Pennsylvania proposal was "highly influential." *Perez-Garcia*, 96 F.4th at 1188 (quoting *Heller*, 554 U.S. at 604). And no court has "unearthed any evidence that the . . . proposed amendments were then thought to be unconstitutional." *Folajtar*, 980 F.3d at 909. Those proposals thus "reflect an expansive understanding in the founding era of the scope of legislatures' power to disarm, particularly among those who most strongly favored enshrining the right to armed self-defense in the Constitution." *Perez-Garcia*, 96 F.4th at 1188. Specifically, they "suggest that the founding generation believed legislatures could disarm individuals deemed dangerous or unlikely to follow the sovereign's laws." *Id.* Given that understanding, the proposals support the notion that founding-era Americans did not understand the right to keep and bear arms to extend to felons who committed serious crimes. *See Folajtar*, 980 F.3d at 908; *Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir.), *cert. denied*, 140 S. Ct. 645 (2019).

**F.      Section 922(g)(1) fits within the tradition of disarmament of felons**

The historical analogues above, "[t]aken together," show that Section 922(g)(1) is valid because it imposes a comparable burden (the "how") on the right to bear arms for comparable reasons (the "why"). *Rahimi*, 602 U.S. at 698.

Section 922(g)(1) prohibits a person from possessing a firearm or ammunition in or affecting commerce if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). A knowing violation is punishable by up to 15 years of imprisonment. *See* 18 U.S.C. § 924(a)(8). Section 922(g)(1) is subject to several exceptions. The provision does not cover certain offenses "relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). It also does not cover state offenses that

Government's Opposition to Goitom's Motion to Dismiss – 15
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

are classified by state law as misdemeanors and that are punishable by two years of imprisonment or less. *See* 18 U.S.C. § 921(a)(20)(B). And it does not cover convictions that have been expunged or set aside, or offenders who have been pardoned or had their civil rights restored. *See* 18 U.S.C. § 921(a)(20). Until 1992, Congress also allowed an individual to obtain relief from Section 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c); *see id.* (granting authority to the Attorney General); 27 C.F.R. § 478.144 (delegating authority to the Director of ATF). But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for such relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

The law, by definition, imposes no "burden" on "a law-abiding citizen's right to armed self-defense." *Perez-Garcia*, 96 F.4th at 1181 (quoting *Bruen*, 597 U.S. at 29). In that respect, it contrasts with the laws in *Heller*, *McDonald*, and *Bruen*, which "broadly prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 1189. Section 922(g)(1) "instead concerns only the rights of a narrow segment of the population arrested and charged with"—and convicted of—"federal [felonies]." *Id.* As to the burden on the rights of that narrow population, it is comparable to the burden imposed by historical laws disarming the dangerous and unlawful and less severe than historical felony-punishment laws, which often included the death penalty, forfeiture of one's estate, and the loss of numerous rights.

What is deemed a serious crime may change over time, but the Supreme Court has explicitly pushed back on the idea that the law is "trapped in amber." *Rahimi*, 602 U.S. at 691–92 ("the reach of the Second Amendment is not limited only to those arms that were

Government's Opposition to Goitom's Motion to Dismiss – 16
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in existence at the founding" and "[b]y that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791").[6] The way Section 922(g)(1) "burdens" the right to possess a firearm is the same or less than historical analogues.

Common sense and experience also suggest that "felons are more likely to commit violent crimes" than are law–abiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *see Mai*, 952 F.3d at 1117 (9th Cir. 2020) ("[I]n enacting § 922(g)(4), Congress determined that, like felons and domestic–violence assailants, those who have been involuntarily committed to a mental institution also pose an increased risk of violence."). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (en banc) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments); *Marchese v. California*, 545 F.2d 645, 647 (9th Cir. 1976) ("There is a legitimate interest in minimizing the felonious use of firearms, and a legislature reasonably may decide that persons with criminal convictions have more of a tendency to commit a crime of violence than persons without criminal records."); *United States v. Walker*, 68 F.4th 1227, 1238 (9th Cir. 2023) ("while an offense under § 922(g)(1) is considered nonviolent, it is a serious felony") (referencing Bail Reform Act factors); *Caron v. United States*, 524 U.S. 308, 316–17 (1998) "Massachusetts treats [convicted felon] petitioner as too dangerous to trust with handguns, though it accords this right to law–abiding citizens. Federal law uses this state finding of dangerousness in forbidding petitioner to have any guns."). In fact, firearms offenses are one of the serious crimes specifically listed in the Bail Reform Act that courts should take into consideration in determining whether release is appropriate pending trial. *See* 18 U.S.C. § 3142(g)(1).

---

[6] *Rahimi* thus answers Goitom's argument that he cannot be disarmed because his predicate offenses "did not exist in" 1791 or 1868. Dkt. No. 41 at 11.

Government's Opposition to Goitom's Motion to Dismiss – 17
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Further, the Supreme Court has recognized that persons "convicted of serious crimes," as

2   a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc.*, 460

3   U.S. 103, 119 (1983).

4          The historical analogues and Section 922(g)(1) are "comparably justified." *Bruen*,

5   597 U.S. at 29. Historical felony penalties sought to punish convicted felons and deter

6   reoffending, and historical gun laws sought to protect against the unlawful or dangerous.

7   *See, e.g.*, Blackstone, *supra* (punishments "amend[]" offender, "depriv[e] [him] of the

8   power to do future mischief," and "deter[] others by the dread of his example"). Section

9   922(g)(1) serves a similar but more limited purpose. It seeks to "curb 'lawlessness and

10  violent crime.'" *Jackson*, 110 F.4th at 1128 (quoting *Huddleston v. United States*, 415 U.S.

11  814, 824 (1974)). Stated differently, the law seeks to protect society from those deemed

12  "potentially irresponsible and dangerous." *Id.* (quoting *Barrett v. United States*, 423 U.S.

13  212, 218 (1976)); *see also United States v. Schnur*, 684 F.Supp.3d 522, 532 (S.D. Miss.

14  2023) (discussing law's purpose). And it does that by barring gun possession by felons,

15  who have previously shown disregard for society's laws and who are more likely to

16  reoffend, potentially in dangerous ways. *See Folajtar*, 980 F.3d at 909.

17          "Congress today, like the founding era legislatures described above, retains the

18  power to disarm narrow segments of the population whom it deems a threat to public

19  safety," such as felons or those convicted of serious crimes. *Perez–Garcia*, 96 F.4th at

20  1189. The Court should thus hold that, taken together, the historical laws discussed above

21  show that Section 922(g)(1) is constitutional.

**G.     Section 922(g)(1) is constitutional on its face and thus any as–applied challenge
22         is impermissible**

23          Section 922(g)(1) is constitutional in all its applications and is not otherwise

24  susceptible to as applied challenges. To uphold Section 922(g)(1), this Court need only

25  recognize that Congress may disarm individuals who have been convicted of crimes that

26  satisfy the common definition of a felony—that is, crimes punishable by imprisonment for

27

Government's Opposition to Goitom's Motion to Dismiss – 18
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   more than one year. In interpreting other provisions of the Bill of Rights that require the

2   Court to distinguish among different types of crimes, the Court has traditionally focused

3   on the "maximum authorized penalty"—which "provides an 'objective indication of the

4   seriousness with which society regards the offense'"—rather than on "the particularities of

5   an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (brackets and citation

6   omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous"

7   crimes, U.S. Const. Amend. V, and a crime is "infamous" if it is punishable by

8   "imprisonment for more than a year," *Branzburg v.Hayes*, 408 U.S. 665, 687 n.24 (1972)

9   (citation omitted). The Sixth Amendment right to a jury trial similarly does not extend to

10  petty offenses, and an offense is petty if it is punishable by a prison term of six months or

11  less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541–45 (1989).

12          This Court should follow a similar approach in interpreting the Second Amendment,

13  which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*,

14  597 U.S. at 6 (citation omitted). When a person has been convicted of a crime punishable

15  by more than one year of imprisonment, they are "categorically different from the

16  individuals who have a fundamental right to bear arms," so a court need not inquire further

17  into the nature of the crime to determine whether disarmament is justified. *Vongxay*, 594

18  F.3d at 1115. Rather, the maximum authorized penalty for the offense by itself establishes

19  that the crime is serious enough to support disarmament. *See Medina*, 913 F.3d at 160–61.

20          A regime of individualized as–applied challenges to Section 922(g)(1) would be

21  unsound in principle and unworkable in practice. To begin, it would distort the separation

22  of powers. *See Mistretta v. United States*, 488 U.S. 361, 381 (1989) ("[W]e have not

23  hesitated to strike down provisions of law that either accrete to a single Branch powers

24  more appropriately diffused among separate Branches or that undermine the authority and

25  independence of one or another coordinate Branch."). In our constitutional system, the

26  Legislative Branch traditionally defines criminal offenses and determines the

27

Government's Opposition to Goitom's Motion to Dismiss – 19
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex–offender registration, and disarmament. *See Loving v. United States*, 517 U.S. 748, 768 (1996) (Congress has the power the define criminal offenses and punishments). The Executive Branch, in turn, traditionally grants clemency or a pardon if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. *See Ex parte Garland*, 71 U.S. 333, 334 (1866) ("The power of pardon conferred by the Constitution upon the President is unlimited except in cases of impeachment."). If federal courts were to create a system of as–applied exemptions from Section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

A regime of individualized as–applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. States have long denied convicted felons the right to vote, the right to serve on juries, and the right to hold public office. And Goitom should not be able to challenge such disabilities on the ground that they do not fit his felony or his circumstances. *See Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (holding convicted felons are not entitled to vote on equal protection grounds); *Spencer v. Kemna*, 523 U.S. 1, 8–9 (1998) (noting convicted felons suffer various collateral consequences, such as ineligibility to serve on juries, hold public office, or obtain naturalization). This Court should not treat the right to possess arms any differently.

A regime of individualized as–applied challenges to Section 922(g)(1) would, moreover, pose serious problems of judicial administration. Until 1992, felons could obtain relief from Section 922(g)(1) by demonstrating to ATF that they would "not be likely to act in a manner dangerous to public safety," 18 U.S.C. § 925(c), but Congress found that

Government's Opposition to Goitom's Motion to Dismiss – 20
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

program unworkable and abandoned it. A congressional report explained that judging whether applicants posed "a danger to public safety" was "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 353, 102d Cong., 2d Sess. 19, 20 (1992). Another report explained that "too many . . . felons whose gun ownership rights were restored went on to commit crimes with firearms." H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996). Unlike an administrative agency, courts "possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli v. United States Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc); *see Mai*, 952 F.3d at 1119 ("[T]he Second Amendment does not demand an individualized hearing to assess [specific person's] own personal level of risk." (internal quotation omitted)).

Accordingly, Section 922(g)(1) is facially valid under the Second Amendment and is not susceptible to as–applied challenges.

## H.    Section 922(g)(1) is nonetheless constitutional as applied to Goitom

Even if this Court were to find that as–applied challenges of 18 U.S.C. § 922(g)(1) are permissible, this Court should find that its application to Goitom is constitutional based on his prior felonies. Goitom has a significant criminal history, including three prior convictions for unlawful firearm possession, three felony harassment convictions, bank fraud, felony assault, and misdemeanor theft, assault, malicious mischief, and DUI. Goitom PSR pp.4–9. And this Court may consider all that history, not just the past convictions specified in the indictment as the predicate offenses that made him a felon. An as-applied challenge asks whether a statute's application to a particular person under particular circumstances deprived that person of a constitutional right. And the particular circumstances of an as-applied Section 922(g)(1) challenge "include facts beyond the predicate offenses alleged in the indictment," which means that "the circumstances of a

Government's Opposition to Goitom's Motion to Dismiss – 21
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

criminal offense can justify rejecting an as-applied challenge to a conviction regardless of whether they were charged." *Moore*, 111 F.4th at 273.

In *Diaz*, the Fifth Circuit rejected facial and as–applied constitutional challenges to Section 922(g)(1) from a defendant whose "pertinent criminal history consists of vehicle theft, evading arrest, and possessing a firearm as a felon." 116 F.4th at 467. Goitom's criminal history, which includes many of these crimes but also felony harassment and assault convictions, is more than enough for this Court to reject his as-applied challenge.

At the Founding, theft of property such as horses—let alone theft via bank fraud—was often subject to the death penalty. The Fifth Circuit in *Diaz* held that Founding-era laws corresponded to the law against theft of a vehicle that served as a predicate offense for Diaz's Section 922(g)(1) charge. Those laws established a historical tradition of severely punishing people who have been convicted of theft. *Id.* at 468–69 (citing Kathryn Preyer, *Crime and Reform in Post–Revolutionary Virginia*, 1 Law & Hist. Rev. 53, 73 (1983)). The Court thus concluded that theft was a sufficient historical analogue to permit a permanent prohibition on the Diaz's possession of a firearm.

Here, Goitom's fraud and theft convictions serve as historical analogues sufficient to justify the application of Section 922(g)(1), and so do his assault and harassment convictions. "Addressing *Bruen*'s two 'central considerations,' the 'why' of these examples aligns with the 'why' of § 922(g)(1)." *Diaz*, 116 F.4th at 469. "Virginia, for example, punished the crime of horse theft with the death penalty for the purpose of deterring the crime. . . . The justification for § 922(g)(1) is relevantly like that of the offered examples: to deter violence and lawlessness." *Id.* "As to the 'how,' these laws achieved their goals by permanently punishing offenders, as does § 922(g)(1)." *Id.* The government maintains Section 922(g)(1) is facially valid, which suffices to deny Goitom's motion. But Goitom's felony convictions for bank fraud, assault, and harassment, added to his history

Government's Opposition to Goitom's Motion to Dismiss – 22
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of theft, provide sufficient historical analogues to establish that the statute is constitutional as applied to him.

## IV. CONCLUSION

Goitom's possession of a loaded firearm in his car on October 1, 2023, was not constitutionally protected conduct. It was a crime under Section 922(g)(1) and the Court should deny Goitom's motion to dismiss.

Dated this 6th day of February 2025

Respectfully submitted,

TESSA M. GORMAN

United States Attorney

*s/Erika J. Evans*
Erika J. Evans
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone:  206–553–7970
Email: Erika.Evans@usdoj.gov

*I certify that this pleading contains 7,374 words,*
*and Motion for Over-length has been filed.*

Government's Opposition to Goitom's Motion to Dismiss – 23
*United States v. Goitom*, CR24–00040

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970